Good afternoon, your honors. My name is Russell Frackman. I represent the plaintiffs in the Lieber case. I would like to speak for as close to 15 minutes as I can. My colleague, Mr. Ramos, who represents the plaintiffs in the Lieber case, will speak for as close to 10 minutes as I can. And we would like to reserve five minutes for rebuttal. Your honors, in our view, there is one single overarching question before the court. And that is whether the defendants can be permitted to knowingly build and operate and profit from a business that is built on and depends on the preventable, I underline preventable here, massive copyright infringement. A business that could be operated lawfully if the defendants chose to, but which they choose not to. In fact, to ignore the ability to operate the business lawfully. You know, when you put it that way, the word that flashes into one's mind is Sony. Almost everything you said could have been applied to Sony. So what's the difference? A great deal of difference, Judge Noonan. But Sony did many of these things that you attribute to Grokster. Sony was a business that at the end of the day, according to the United States Supreme Court, operated largely and primarily lawfully for time-shifting purposes. That wasn't the criterion. You know that. No, that was not the criterion. It was just that they could put out, quote, a substantial number of non-infringing users. It was a, they had a substantial, a primary number of non-infringing users. Is that in Sony? Yes, your honor, 75 percent, according to the surveys. Is that part of the opinion? Yes, sir. Where? It's in the footnotes in Sony that discuss, in particular, the surveys that were conducted by both sides. This makes the difference? It's primary? No, your honor, that's one of the considerations. That's something you found in the facts of Sony. It's not, I don't think you'll find it in Justice Stevens. Sony is obviously a very fact-intensive opinion. That is one of the aspects. I mean, you want to distinguish Sony, but 80 percent of how you presented the question, every word would apply to Sony, and I want to know what the difference is. If I can, Judge Noonan. Go ahead. The difference is, in Sony, there was, number one, no evidence that the infringement was preventable. The injunction sought by the plaintiffs in that case and what the Supreme Court said was, if we find in favor of a minority number of plaintiffs here, 10 percent, who own a minority amount of copyrighted works, that's the end of the technology. It's shut down. It's over. It's done with. And under those circumstances, at the very least, it is not just or proper or appropriate or fair to permit a minority number of defendants to close off a technology. Number two, Judge Noonan, and in difference to what I posited the question here, there was no evidence in Sony that the business, that the VTR machine could be operated in a non-infringing manner. Let me put it this way, that the infringements could be separated out from the non-infringements. It was an all or nothing situation. Number three, Judge Noonan, in Sony, there was no ongoing relationship. The Supreme Court makes a point of saying that. Sony made a product, put it into the stream of commerce, sold it, got its money when it sold its product, and that was the end of it. The defendants here make their money in just the opposite way. They give away their product, their software. In fact, they license it because they continue to hold title to it for the very purpose of capitalizing from this ongoing relationship, advertising relationship that they have. An ongoing relationship that I would submit to the court and supported by the record is based on 90 percent infringement. In a situation where they could have filtered precisely the same way that this court ordered Napster to filter. Because Judge Noonan- Is there anything in Sony that tells us we ought to look at the percentages? Anything in the opinion of the court? Isn't the word substantial non-infringing use? The court in Sony uses several iterations. One is substantial non-infringing use. The other one is commercially significant non-infringing use. Is that not the case here? No, Your Honor. It definitely is not the case. Judge Wilson, in his opinion, indicated that there or seemed to believe that there was no dispute. However, as we've set forth in our briefs, there was a significant dispute as to whether there was a substantial non-infringing use here or a commercially significant non-infringing use. You had one of the briefs that said there was something like 700 million files. Is that correct? Oh, I would imagine many, many more than that. Many more than that. And that your highest figure of your protected uses was 90 percent. So 10 percent of 700 million or something are non-infringing. That sounds like a lot of non-infringing files to me. Actually, Your Honor, to be precise about it, 90 percent were infringing. The other 10 percent we could not determine. Well, that's your figures. Yes, Your Honor. In Napster, I would point out to the court, the number was 87 percent infringing. This court in Napster indicated that there were non-infringing uses. Napster's new artist program, for example. And what this court in Napster said was that doesn't matter. And it doesn't matter for a couple of reasons. It doesn't matter, number one, because the plaintiffs aren't trying to stop those non-infringing uses, only the infringing uses. And it doesn't matter, number two, this court said in Napster, because the Sony case is of little assistance. That's this court's language, of little assistance to the plaintiffs, to the defendants, I should say, because of actual specific knowledge of infringing activity. That's the way this court read the Sony decision. Because at the end of the day, Your Honor, everything I said about the defendants here, I would submit, I could have, and indeed three years ago did say, about Napster. But at the end of the day, we have to look at the Supreme Court, I think. We can't. Absolutely so. Absolutely so. And in fact, I want this court to look to the Supreme Court in that regard, just like this court in Napster looked to the Supreme Court. This court has a lengthy discussion in Napster of the impact of the Sony decision in this particular case. And I would, I would, I glean from that two things, at least. Number one, that this court had an interpretation of Sony, which I would submit is consistent with Sony, that said that Sony stands for the proposition that the court may not infer simply from the mere fact that a product, and of course our view is this is not a product, it's a system in a business, but a product, from the mere fact that a product may be used for infringement, the court may not infer knowledge. This court then said, that is not the case here. The plaintiffs are not asking us to infer knowledge from the mere fact that the product may be used for infringement. Didn't Sony advertise its product as a way of taping your favorite shows? According to the Supreme Court, no. There was no advertising that induced, in the Supreme Court language, no advertising that induced infringement in that case. You're a little skeptical of that, aren't you? Not really. I was just coming through to find the quote, which, and I am not skeptical of it, Your Honor. I know it's near the beginning, but I don't know exactly where. But if I may, the Sony decision informed this court's view of Napster, this court's view of online infringement. And what this court said was, we don't have to rely, and the plaintiffs aren't asking us to rely, on the mere fact that a product may be used to infringe. They've got overwhelming evidence, and we, and the court cited it in Napster in a footnote, including actual notice of 12,000 files. Well, here we gave actual notice of 8 million files. They have overwhelming, both actual and constructive knowledge. And that makes, that simply makes Sony inapplicable as a defense here. And what this court ended up saying in that regard, if I can direct the court to the end of the Sony discussion, and that's on page 1021, regardless of the number of Napster's infringing versus non-infringing uses, the evidentiary record here supported the district court's finding that plaintiffs would likely prevail in establishing that Napster knew or had reason to know of its users' infringement of plaintiffs' copyrights. And that's why this court said Sony is of little assistance. Now, the district court, Judge Wilson, ignored this issue and this standard. And in addition to ignoring it, I would submit, Your Honors, he, number one, said that there was no issue as to substantial non-infringing uses here. A, under Napster 1, that doesn't matter, because there was no issue as to actual specific knowledge. But B, it was seriously contested. The only evidence in the record is the evidence that we put in, 90 percent infringing use. The defendants, who had at least equal access to their systems and to their indexes, chose not to put in any evidence at all of the percentage of infringing versus non-infringing uses. The only ---- But Judge Wilson does refer to, he makes a finding that there are substantial non-infringing uses. That's a finding of fact. Well, but he can't do it. You have to show it's wrong. No, he can't do that, Your Honor. This is summary judgment. It's contested. All I have to do is show that it's ---- How can it be contested when all you've got is 90 percent, and there's 10 percent that is the other? And that ---- Where's the contest? The contest is that it has to be substantial. 90 percent ---- 10 percent is not substantial? No, Your Honor. 10 percent is, number one, not substantial, when you have 90 percent that's infringing. That's a question of law. Number two, number two, in Napster, of course, we had 87 percent, not 90 percent. I don't think the percentages are established. Number two, it was their burden to come up on this defense to show what was non-infringing. We had anecdotal evidence. That's all it was. That may be good enough. I think when you examine the evidence ---- What? When you examine that anecdotal evidence, you see one work of Shakespeare here, lots of reference to peer-to-peer systems generally, not to these systems, very nonspecific. When we did our survey and we picked out, I think it was 1,600 at random, there wasn't a single public domain material there. If you look at Judge Wilson's examples, in his opinion, they are indeed not non-infringing uses. He talks about distributing movie trailers. That's not non-infringing. That's an infringing use. That's copyrighted work. He talks about using the software where it's legal. Well, it may be legal outside the United States, but this is a U.S. case based on U.S. copyright law, U.S. infringers, U.S. copyrights, U.S. plaintiffs, or sharing the works of Shakespeare, in which, in the record, there is maybe a single work of Shakespeare or a couple that were found. Not only that, Your Honor, what the Supreme Court says is not only must it be substantially non-infringing use, it must be a commercially significant non-infringing use, which is to say it has to be something that they could base a business on. There was absolutely no evidence here that this business, and one would expect absolutely no evidence, that a business that is based on Napster, they started out based on Napster, OpenNap, bringing Napster users, Napster's works. When this Court said their users are infringers, the works are infringing, they took those users and brought them to their systems. That's the basis. That's the commercial basis of their system. That's in the record. You have to have a commercially significant use. They had barely any use. It certainly was not commercially significant. And ultimately, Your Honor, I would submit, and my portion of my time is fleeting, but I would leave you with the one final thought that I think pulls it all together, which is if 10 percent is significant, and if 10 percent is commercially significant, then let them build their business on the 10 percent, and they can go on and do it with a simple fix. They can eliminate the 90 percent infringement, same kind of simple fix that Napster was required to implement, and the copyright law cannot and ought not to tolerate 90 percent infringing, 90 percent infringement, that is fixable, in a business, operated for profit, simply because there is a very small number, as there was in Napster, of non-infringing, assertedly non-infringing uses. Let me break it down. We focused on the word preventable, and the District Court made a finding, or at least made the observation, that if you shut down these services today, that the infringement would continue. I think the words were that the users would share files with little or no interruption. I guess two parts of the question. One is, do you agree with that? And two, if it's true, then aren't we just chasing the wind here? Isn't this use going to continue, and, in fact, you really are left without a remedy? No, it's not true, Your Honor, or not accurate, I should say. A couple of things. We pointed out in our brief, our expert, Professor Horowitz, testified in his declaration that if they simply walked away, the system would eventually degrade and it would disappear. It would close down. Certainly Grokster, all they have to do is stop paying their 60% to their licensor. We saw what happened to Music City when it stopped paying. It was gone. That's number one. Number two, Your Honor, I would submit that, so I think it's factually incorrect and certainly contested in the record, but maybe more important, I think it also, in a sense, is asking the wrong question. After all, when Napster was closed down by this court, it continued, open NAP. They used open NAP. Napster continued. That didn't mean that this court ought not to shut down Napster for massive infringement, but the fact, the wrong, the wrong has been done, the putting together of the system, the operating of the system, the fact of the matter, as we pointed out to Judge Wilson, is they haven't walked away. And they're not going to walk away because that's how they make their money. And finally. I guess the question is, especially if we're talking about open source programs, that's out in the stream of commerce. It's going to be very difficult to control that, even if you obtain an injunction in this case. It's more of a practical question. You've got two aspects here. Of course, you have the fast track system, which is a closed proprietary system. And then you have the Morpheus system. The Morpheus system does interact with Nutella. The evidence in the record, by the way, is it is not Nutella. It is the majority of that program is proprietary to Streamcast. But the fact that if they walk away, nothing might happen, doesn't answer the question of the ability to control. They can be ordered by this court, as Napster was, to do something to control. If I leave my office with the light on without flipping the switch, the light's going to stay on, but it eventually will burn out. That's what we've said here. Eventually this will disappear. But I also have the ability to flip the switch. And what we're asking ultimately the court, Judge Wilson, to do is to order the same kind of injunctive relief that this court affirmed in Napster 2, which is, in essence, flip the switch, the defendants, control it. And the evidence certainly is that even though it is based on Nutella, even though it is a decentralized system, filters and blocks can be put into place that will limit the infringement over that aspect of the system. And based on Napster 1, based on Napster 2, that is not only something that ultimately we believe the district court should order after this case is reversed, but it's not an idle act. We're dealing with millions and millions and millions of users here who can be blocked from distributing and copying copyrighted works. Thank you, counsel. Your colleague's getting nervous, so you better get him. So was I. May it please the court, my name is Harry Ramos, and I'm here today on behalf of over 27,000 songwriters and music publishers who own the rights to over 90 percent of the music recorded in the U.S. They've been certified as a class in this case. I was going to begin by talking about how effectively defendant services are built in the backs of my client's music. That's what lures people to these sites. They don't go there because they think their technology is cool. They go there because they want to get music and movies. And that is reaching into my client's pockets. But I'd like to address some of the points, one of the points that came up that Judge Norris had asked about, and focus on a couple of very specific issues and then step down. One thing I wanted to clarify with regard to Judge Norris's question is on the 10th. Pardon? Judge Noonan and Judge Norris. I apologize. The – forgive me. The 10 percent that Mr. Frackman referred to and that Judge Noonan – forgive me, Your Honor – asked about, we were not able to determine whether those were infringing or not. In other words, we couldn't figure out what those were. We did not find any of the examples that were given by the defendants. We didn't find the Bible. We didn't find Shakespeare. We didn't find any of the non-infringing works or categories of non-infringing works they referred to. We just weren't able to identify them. Those may be infringing as well. We put forward a survey that showed that we were able to determine 90 percent were infringing. They did not put forward any competing survey. So there's no opposing evidence on the other side saying that 10 percent is not infringing or any other number is not infringing. That is the sole record here. And as Mr. Frackman said, I think 90 percent is by definition higher than 87 percent. Second, defendants claim that all they do is distribute software. In fact, they do much more. They upgrade software. They promote their services. They filter out pornography and computer viruses. But let's just focus on the software and demystify it a little bit. Software is a set of instructions. This Court has said that before. That is what software is. It's instructions to a general purpose computer to do something. And here those instructions are to create a massive network for trafficking in pirated music. This includes instructions to users' computers to become supernotes, listing available music and movies,  and most significantly, those instructions include a hook that requires that the user's computer go back to the defendant's website every time they enter the network so they can sell their advertising. That's key here. As Mr. Frackman said, there is a continuing relationship between the defendants and their users, and they're following the instructions that created the network that creates the site and facilities that this Court spoke about in Napster. There's no question that if defendants had formed a network for trafficking in physical pirated goods by distributing instructions to each of the participants in how to copy and distribute the pirated goods, they'd be liable. Irrespective of whether they were careful to be sure they weren't physically present at the moment the goods changed hands because they wanted to argue later, we couldn't stop that sale. We weren't there. They would be liable. So why is it any different here? The defendants use the talismanic term technology as if that's going to give them immunity. And I would suggest to this Court that the Internet is not a license to steal. There's nothing different from what they're doing from organizing and instructing the participants in a trafficking network that is trading in counterfeit materials than what they are doing. Let me say what I think your problem is. You can use these harsh terms, but you are dealing with something new. And the question is, does the statutory monopoly that Congress has given you reach out to that something new? And that's a very debatable question. You don't solve it by calling it theft. You have to show why this Court should extend a statutory monopoly to cover the new thing. That's your problem. Well, Your Honor — To address that, if you would. Your Honor, I would be — Rather than use abusive language. Your Honor, and to get your name wrong, which I apologize for. I'm sure Judge Norris has an opinion on this. I keep coming back to it. The — That is an important point. Pardon me? It is an important point. I hope you address this question. Yes, I will, Your Honor. The Copyright Act specifically contemplates there are going to be changes in technology. If you look at the definitions in the Copyright Act, they're broadly drafted to anticipate that there will be changes in the technology by which copyrighted materials are distributed and copied. And, indeed, in this regard, I can speak on behalf of my clients. In 1995, Congress amended the Copyright Act specifically to say that the regime for copyright that applies to musical works, which my clients own the rights to, would apply on the Internet as well as in the physical world. And I think that makes it absolutely clear that was Congress's intent. Congress anticipated that technology would change and, in effect, asked the courts to enforce the laws as technology continues to evolve. Were that not the case, we would very quickly — my clients would very quickly lose their rights with every new piece of technology that comes out. But I do want to emphasize, because Judge Noonan used — I guess I may have used the word fabtrudge, and I didn't use the word monopoly. The copyright monopoly is very limited. It has numerous exemptions for facts and other things. It is a very weak right. It is an ephemeral right. Once my clients write songs, they can't put them back into a lockbox. They're out in the world. And they rely on the courts, on the law, to protect them. If the law is not there to protect them, they effectively lose their rights. That is what we fear has happened here. They are not able to be compensated for the massive distribution of their works on these services. But one other thing I wanted to say, and then I will sit down, is that these defendants originally had registration servers. They required everybody to register. And that gave them the ability to kick people off if they wanted to. And in Napster, this Court specifically said, if you have that ability, that constitutes the right and ability to supervise under the vicarious leg of our claim. Let's not go to the damage portion of the case, which is not before us, though. No, Your Honor, I think it is not. It goes to the question of whether they have the right and ability to supervise with regard to vicarious liability. And remember, vicarious. All right, but I understand the system now. They agreed. Yes. I understand the system now. You can correct me if you think I'm wrong. That ability no longer exists in the system. Your Honor, it doesn't exist in the system for a very good reason. They got rid of it intentionally. At the record, page 5114, you will find a request from Grofster to Kazar, to Mr. Zennstrom, who is responsible for writing the fast track software. Quote, per our contract, please forward to us the latest update that includes no requirement for a registration server and any other improvement upgrades that are currently available. They wanted to get rid of that. They got rid of it shortly after we filed our lawsuits. I think that's very telling. And it clearly establishes they have the right and ability to do it. They did it before. Why did they get rid of it? Registration is a very valuable thing from an economic standpoint. It's very common in the computer industry to register users when they come to their site. They disabled it, I would suggest, because they knew under Napster that proved that they were liable. And I think that that's like taking this pedometer out of your car and thinking you can beat a speeding ticket based on that. Or perhaps they were just trying to take a lesson from Napster and get a use that was conforming with existing law. I'm sure that's what I'm sure they'll tell us that. But it's their turn. It is their turn. And I thank the court. And again, we will apologize for taking the extra time. Thank you. Do you have a time division as well? Yes, Your Honors. May it please the court. Fred Von Lohman representing Apelli Streamcast Networks. I'm here with Michael Page, who I will be sharing my time with, who represents Apelli Grokster. The record here is replete with undisputed evidence that the Morpheus and Grokster software products are being used today to distribute millions of authorized video games, millions of authorized songs. Jive Media has distributed hundreds of thousands of authorized music videos for one artist alone. Famous bands such as Widespread Panic, Pearl Jam, Phish, Dave Matthews Band, have all authorized the sharing of their live concert recordings among their fans. In fact, contrary to Mr. Frackman's representation, Appellant's own expert in searching the network was unable to avoid finding the Bible, the Koran, and the Communist Manifesto demonstrating the use of these networks to distribute public domain materials. The record is undisputed that these pieces of software are capable of substantial non-infringing uses. The Appellants here do not seriously contest the capability for non-infringing use. Instead, they make the same arguments that two of their number made before the Supreme Court 20 years ago. They argue then that Sony's executives knew that the Betamax would be used for infringement. They argued then that proportion should be the test, that primary use should be the test. And they argued, again, contrary to Mr. Frackman's representation, that the Betamax could be easily modified so as to prevent or reduce the incidence of infringing uses. On that point in particular, I direct the Court's attention to page 494 of the Sony ruling in Justice Blackmun's dissent in which he discusses this so-called jamming possibility. The Supreme Court nevertheless rejected those arguments, as this Court should here today. Well, you know, I think you're absolutely right as far as Sony goes. Your problem is the gloss that Napster managed to write on it. I would agree with your earlier question, Your Honor, that, of course, the Sony ruling must control. But I will say this. I think the Napster gloss is not nearly the problem that Appellants would have you believe. In fact, Appellants distort what I think the perfectly sensible ruling in Napster was by saying, in fact, that any notice delivered to a defendant automatically deprives them of the Betamax defense. That is not the holding of the Napster opinion. On page 1021 of this Court's Napster ruling, the Court extensively discusses what more needs to be shown before a defendant can be held liable. Judge Wilson read that portion of the Napster opinion closely and concluded, in conjunction with other precedents on this point, such as the Vault v. Quaid case in the Fifth Circuit, that more is required merely than notice, that there has to be specific knowledge coupled with, in conjunction with, the capacity to act on that knowledge. The rules suggested by Appellants would lead to terrible results. Imagine, for example, if delivering a stack of notices to Xerox regarding the misdeeds of a Kinko's coffee shop would suddenly make Xerox liable. They, after all, would then have actual knowledge. As the Appellants constantly reiterate, actual knowledge is not enough under the Sony case and under this Court's Napster ruling. There has to be a conjunction of actual knowledge with material contribution. That was the piece that was missing here, as Judge Wilson correctly found below. It's undisputed here that the defendants had actual knowledge, right? It is undisputed that notices were delivered to these two companies regarding specific infringements that allegedly were occurring on the network. I would agree that that would create actual knowledge under this Court's Napster ruling. Of course, as Judge Wilson found, that alone is not enough. If it were, the Sony case today could be relitigated to a different result simply by delivering a stack of notices to Sony regarding users of VCRs who were committing copyright infringement. I'd like to also specifically address a question that Judge Thomas asked regarding whether or not the software would continue running if these companies were to close their doors, unplug all their computers. The answer is undisputed in this record that, yes, it would continue running. I would direct the Court's attention on that point to our brief, the streamcast brief at footnote 10, where we discuss the record on this question in specific, and in particular, direct the Court to volume 26 of the record where appellant's expert, Professor Horowitz, was deposed on this very question. And in volume 26, on page 76, 27 through 32, the expert was, in fact, forced to withdraw his prior statement in his declaration, in which he said, sure, this software would eventually decay of its own accord. Under examination and deposition, the professor was forced to concede that if the computer was running and continued to be unchanged, it would continue to run, barring, of course, the slow decay of parts that may be contained in the computer. Go back to your Xerox analogy. Are you aware of any publishers suing Xerox? No, Your Honor, although I do know this is not in the record, I'm afraid, but I do know from personal knowledge that both Xerox and Kodak were under threat of suit when the photocopier was first brought into the market. The American Publishers Association chose not to do that and chose instead, rather tellingly, to pursue the actual institutions that owned the photocopiers, leading to the famous case, American Geophysical Union, where, in fact, a research institution was held liable for using photocopiers in ways that was infringing. In fact, it was not until 1976, the Sony case, was the first case ever brought against an equipment manufacturer for contributory and vicarious infringement. Well, your software does a little bit more than provide mechanical means, though. In the sense of you're searching the metafiles of the particular MP3 files, you are providing the users with a fairly sophisticated way of searching what is almost surely protected works, aren't you? It's not just a decentralized system. Well, go ahead and answer. I would disagree, Your Honor. Respectfully, I believe it is a decentralized system and that the undisputed testimony of the experts makes that clear. I agree with you that the ability to parse for metadata, song title, album, artist, and things like that, make the tool a more powerful search tool than a tool that does not include those features. However, there's no reason to assume that just because you have the ability to search for an artist's name, that that necessarily dictates infringing uses. In fact, we have evidence in the record that two million songs by Prodigy have been distributed with authorization, that music videos by artists like Lil' Romeo are distributed with permission. Similarly, live concert recordings by a number of bands, all of which were found. There is clear evidence in the record that someone searched on the network. We had an individual search on the network and ascertain that all of these files were, in fact, available on the network. So I would submit that the ability to use metadata to refine your search, to find authorized files, is a perfectly legitimate use. And in fact, these companies are always working to make their searching capabilities more powerful, just as a company like Google would be. What do you think we ought to hold in terms of what constitutes substantial non-infringing activity? I believe in light of the Supreme Court's ruling in Sony, as well as the vault case and the patent context, I think the proper formulation of the rule is whether the non-infringing uses contribute independent commercial value to the product. Even if the commercial value is de minimis? Yes. And in particular, there I would direct the Court's attention to the Fifth Circuit's ruling in the vault versus quaid case, where it was conceded that the non-infringing uses standing alone would not have supported a market for the product at all. Nevertheless, the Fifth Circuit found that the product in question was capable of substantial non-infringing uses. In other words, the Court refused to imagine a hypothetical product, where the infringing and the non-infringing uses had somehow been segregated, and then imagine a market and attempt to figure out whether one or the other would sell. That's not the teaching of the Sony case. And in fact, in the Sony case, on page 441 of the majority opinion, the Court discusses the rule from the patent context. They imported the rule from the patent context, and they specifically quote a number of their own prior rulings saying that in order to be viewed as lacking a substantial non-infringing use, a product must be uniquely suited for infringement or, quote, have no other use than infringement. So I would submit, Your Honor, that the test is not whether or – it's not enough that a product may have – may not have enormous market success based solely on its non-infringing uses. That's not the test. So under your formulation, it wouldn't matter whether it's 90 percent, 95 percent or 99 percent of infringing use, right? I think that's correct. The proportionality standard was specifically what was rejected by the Supreme Court in the Sony case. This Court in 1982 specifically found for the movie studios in that case on a theory that the primary use should control. Justice Blackmun's dissent in the Sony opinion also sings the praises of a proportionality approach. That, however, was expressly rejected by the majority. In fact, I think the Court's – the section of the opinion in the Sony decision in Section 4A of the Court's opinion is very telling on this point. The Court found that the Sony Betamax VCR was capable of two substantial non-infringing uses, either of which would have been enough to support the Court's ruling in favor of Sony. In Section 4A, the Court discusses authorized uses of copyrighted works and in particular focuses on Mr. Rogers, the ability to record sports programming, and points out that only 7.3 percent of Sony Betamax users were using the VCR for recording sports programming, for example. Nevertheless, at the very end of Section 4A of the Court's opinion, it says that alone is enough to state a substantial non-infringing use. So I think, in fact, perhaps if we went beyond the 93 percent threshold, there may be a question that would be open. But plainly, under Sony, anything below that threshold, if we have a situation where, as I believe Judge Noonan pointed out, the best the appellants could do is come up with a 90 percent figure, I think the decision is made by Sony, if you will. I'd also like to point out that appellants' position suffers from, I think, a more fundamental flaw. That flaw is ignoring the animating principle behind the Sony opinion. In that opinion, on page 431 and 432 in particular, before the Court goes into its analysis, it explains what is motivating its concerns. It says that it has always been the realm of the legislature to define the scope of the copyright monopoly. Copyright is a creature of statute. It has always adjusting, as Mr. Ramos pointed out, to new technologies. What Mr. Ramos failed to point out is who is responsible for the adjusting. The Court, in the Sony ruling, told us the answer to that question. It is Congress, in the first instance. The reasons for that, I think, are quite straightforward. First, it is a bad idea to decide the fate of a technology in its infancy. In fact, I think it's quite plain that in the early days of the VCR, when the movie studios, as one, refused to license their films for reproduction on prerecorded cassettes, that the movie studios had a much more serious problem with infringement when it came to the VCR. When, in fact, they entered the market, participated in the market, offered consumers choices that were non-infringing uses, their problem changed. And, of course, they went to Congress and sought numerous solutions for what they perceived as the VCR problem. In the end, in 1998, Congress gave them a partial solution. There is now a technology mandate that applies to VCR vendors in this country. Similarly, as Mr. Ramos alluded to, in 1995, Congress created a new regime of compulsory licensing, mingled with a technology mandate to address the new problem of webcasting, the digital transmission of music, internet radio, if you will. Similarly, in 1992, Congress enacted the Audio Home Recording Act to address a new digital technology, the digital audio tape recorder, mingling a compulsory license with a technology mandate. These are the kinds of nuanced solutions that courts are not able to provide. As the Supreme Court points out in the Sony case, Congress has given to copyright owners, for a violation of their exclusive rights, a, quote, potent arsenal, unquote, of statutorily mandated remedies. A court is not able to fashion freely intermediate regulatory solutions to address the tension between new technologies on the one hand and copyright owners' interests on the other. That is exactly what the Supreme Court recognized in the Sony ruling and the animating principle for the outcome there. And again, I think it's really rather odd that copyright owners, that the clients that Mr. Ramos represents would suddenly abandon what has worked well for them for 100 years, namely legislative solutions, in favor of asking a court to step in and apply what have to be much less nuanced remedies to the problem. Your Honor, I would like to leave the rest of my time to Mr. Page to address the vicarious liability issues, unless you have further questions. Thank you, Counsel. Good afternoon. May it please the Court, my name is Michael Page. I'm appearing on behalf of Appelique Grokster. Grokster is a small family-run company which licensed the Fast Track software from its creators and resells it or redistributes it under the Grokster name. It is undisputed in the record that Grokster had and has no input into the design of the file sharing features of the Fast Track software. It is undisputed in the record that Grokster has never had and does not have access to the source code for the Fast Track software. And it is undisputed that today Grokster has no ability whatsoever to see what individual users are doing with that software, much less control it. They no more have the ability to control what they do than Microsoft has the ability to control what people use Outlook for. Appellants don't really dispute that. What they're really saying is that Grokster and Streamcast and later Kazaa have the theoretical ability to have built a different product that would have given them that control. They say that we could have built a product that involved filtering. We strongly dispute that proposition. There's certainly no evidence that filtering would work. In fact, the name-based filtering in Napster was a complete failure, leading these appellants in the Amster case to tell the court that it was, quote, wholly ineffective. Napster then attempted to implement digital fingerprinting, and after many months and many millions of dollars of effort, that failed. So it's very much disputed whether, in fact, there's any solution that an individual technology vendor could do, much less a simple one. But that's not a question this court needs to answer or even ask. It's the wrong question. The correct question is, does the current software give people the ability to distinguish between infringing and non-infringing uses and eliminate the former and not the latter? The solutions analogize to flipping the switch on the wall. Don't do that. That's saying you have control because you have the ability to just go away. If Sony had that level of control over what its users did, it could simply stop selling VCRs. Any technology vendor has that ability. The ability to control is simply the ability to go away. The problem with looking at what you could have built and whether it would control is that it expands the rule of vicarious liability without limit, because for a vicarious liability, you need only two things. You need a direct financial interest, which under the precedents has become simply any attenuated financial interest, and you need the ability to control. If the ability to control just means you could build a tool that would better suit the copyright holder's interests, then Microsoft is clearly liable. The operating system would be the best place to put filtering. Every ISP is clearly liable. All of this traffic moves through ISPs. Every manufacturer of CD burners is liable because you could build them, just as Justice Blackmun suggested in Sony, to refuse to record anything that wasn't authorized. This question was answered definitively by Sony. As Mr. Von Lohman pointed out, Justice Blackmun in dissent said, Sony should be liable. They could have built a VCR that respects a flag in the content and refuses to record it. Nonetheless, the majority found that Sony was not liable. The Napster court reached the same conclusion. These same appellants urged the Napster court to hold Napster liable because it could have holistic premises. What the Ninth Circuit said in that was precisely that. When you get notice, it gives rise to a duty to police your premises, but that extends only to your border, and the Ninth Circuit was very careful to say that the duty to police is cabined by the current architecture of the system, not what could be built down the road, not what plaintiffs here would rather have seen built, but what control the defendant actually has. To expand the law of vicarious liability, to attach liability to anyone who in theory could have acted as a policeman, leaves no border on it at all, and leaves every technology vendor, every inventor, every merchant at the mercy of copyright holders who want to look around and go, you could have done something about this, you're liable. It's also bad policy. Regulating technologies in their infancy is a bad idea. Imagine had the Supreme Court agreed with appellants and had said VCRs are illegal because you could build them to have that control. Today, VCRs garner more income for the music industry than movies. They would not exist had the studios gotten their wish and had them banned. They told the world that the VCR was to copyright as the Boston Strangler is to a woman alone at home, and predicted that it would be the death of copyright. This is not a new theme. Every time a new technology comes along, those with a vested interest in the old technology first ask the courts to ban it. Thankfully, the courts say no, and when they do, the copyright holders then find a way to make money off that new technology, because every time technology removes the transaction costs between the artist and the consumer, that leaves money available for the artists. Radio was going to be the death of copyright. How can we compete with free? You're sending our music out into the airwaves for free for anyone to have. But when courts decline to stop technology, people find a way to develop those technologies, to further develop non-infringing uses of those technologies, and to monetize them. And in the long run, it is always good for the consumers and the copyright holders. Efficiency is good for everybody, and these systems are simply more efficient versions of distribution. They have now reduced distribution costs not low, but to zero. Courts should not step in and stop that progress. Appellants have raised the issue of, but didn't you once have that ability, saying there were once central servers? There were registration servers. They existed because the earlier versions of the software couldn't do other things without that registration server. If we didn't have a central registration server, when someone went to send an instant message to a user who had chosen their own username, the existence of multiple people who chose the same name made it impossible. Programming advances got to the point where the system was able to But more to the point, when that registration server existed, it made no difference. Taking someone out of the registration server would keep them from being able to receive advertisements. It would keep them from being able to send instant messages to each other. It would keep them from being able to register in chat rooms, but it would not stop the file sharing functions. And even if it would, and it did not, that's not before this court. The district court very carefully limited its ruling to the current version of the software. Grokster, in fact, asked for a full summary judgment ruling and instead got a partial summary judgment ruling that addressed only whether there is liability for distributing the current software standing alone. As to any of the factual issues of previous systems or what it used to be able to do or whether something someone said to a user once is a material assistance to infringement, those issues have not been decided by the district court. Another comment on appellant's argument that things are easily fixable. First, the right question is, where does the obligation to change one's software to police other people's copyrights come from? Well, in Napster, it came from the court. Well, no. Respectfully, in Napster, it came from the fact that Napster had failed to exercise control it currently had. And the Ninth Circuit's order in Napster, this court's order, said that that obligation is capped by the existing architecture of the system. Right. Therefore, they were liable. Your colleague has pointed out that many of the techniques used to comply with the injunction simply didn't work in a technological manner. In other words, the filtering was ineffective. So it was something new that was attempted in Napster as opposed to the architecture of that system. You couldn't just shut off. They had to do some additional programming in Napster to comply with the injunction, is what I'm saying. Napster actually went to develop a fingerprinting system. All along, Napster wanted to build a system that worked sufficiently to be licensed. Their goal wasn't to be a pirate forever. It was to be a licensed outlet. The fact that the district court was able to order Napster to continue developing that new technology arose in the context of the remedy once there was a finding of liability. It was only because there was a failure to exercise the control Napster already had that there was liability in the first place. The liability finding in Napster does not spring from the fact that Napster didn't build a different system. It springs from the fact that they didn't do what they could with their existing system. And, of course, that is the seminal difference between Napster and these defendants that the district court alluded to and that appellants, as the district court put it, refused to appreciate. Unless the Court has further questions, I'll submit. Thank you, Counsel. Thank you. I'll give you five minutes for a vote. Not fast. Just to, if I can pick up where Counsel left off, there is no distinction between what this Court ordered Napster to do and the remedy of filtering here. It is not, if the Court looks at the record in the Napster case, Napster did not have in place a filter at the time this Court ordered it to filter. What Napster had was an index that it didn't look at. What it had, it had, and this Court says so, did not have the ability to determine whether something was copyrighted or not copyrighted. No content went through Napster's system. How do you respond to Counsel's rejoinder to me that that really is a question of remedy and not a question of liability? That was not a question of remedy, Your Honor. In Napster 1, what this Court said was that you've got, you, Napster, have to exercise your reserved right to police to the fullest extent that you can. And the way you exercise it is by filtering. And one way you exercise it, at least, is by filtering. And when you do not exercise that fully in Napster 2, this Court said, you're shut down. Now, it did some filtering. Napster 2, in Napster 2, Napster came to this Court and said, that's beyond our architecture. And the Court said, no, that's your duty under vicarious liability to police. You have to implement a filtering system to the extent it is feasible. And there is no principal difference between the position that the defendants are in here and the position that Napster was in in that case. While we're talking about vicarious liability, I might add, as the Court is aware, the Sony decision, as this Court said in Napster, does not apply to vicarious liability. So here we have, number one, Judge Wilson's finding that there was a direct financial benefit, and number two, in several ways, the ability to supervise, one of which is the ability to filter. Another one of which is the ability that these defendants admittedly had, and they disabled themselves from implementing. The registration system, the registration server, is identical to what Napster had and what this Court in Napster said was sufficient to impose liability, it was sufficient control, ability to control. They disabled themselves from doing that. No clearer case, I would submit to the Court, of turning a blind eye can be found than having something that the Court says is the ability to supervise and then saying, take it away from me. They have another ability to supervise that this Court said was sufficient in Napster and in Fonovisa, and those are their terms of service. They have the absolute right under their terms of service, their end user license agreement, to disable sharing by users, to do away with users, to bar users. They actually did it. They banned users. They banned by IP address. They banned by username. They exercised that right. Now, they're in no different position, I would submit, to the Court that had Napster, the day after this Court ruled, said we're closing our registration servers. Well, that would not be permissible, and it's not permissible here. They had that ability, and they had to fully exercise it. Instead of fully exercising it by filtering and blocking, as Napster did, they disabled their registration systems and said, sorry, we're not going to do that. And I would submit to the Court the ability to supervise is much broader than that. Can you address the Xerox analogy for a minute? Yes, I would. I would, Your Honor. Now, it wasn't what is common knowledge that brought to Xerox's attention, that lots of books are copied in violation of copyright on Xerox machines, and they stopped selling them. You have in the Xerox situation several differences from here. The first is that Xerox is not forming a nationwide anonymous distribution system. It is not building a business that's based on infringement. It is in that respect arguably not contributing materially in the same way as somebody who builds a business, an anonymous marketplace to distribute copyrighted material. Second, what these people are doing is they are distributing, upgrading, maintaining, keeping anonymous, known infringers. It's an ongoing relationship. If you told Xerox that there is a band of thieves, a band of pirates out there, that are using these machines to infringe, then under the law of aiding and abetting and contributory infringement, if they continue to supply those machines to a band of infringers and to upgrade them and upkeep them and tell them how to use them, give them advice and counsel. You don't think Kinko's would qualify as ---- No, I don't think so, Your Honor. I don't think so. But if they do, then I think that that's an issue. You've got round pegs and square holes here. And if I can close by coming back to the Sony case. Let's say that Xerox received notice that students at UCLA and their zeal for Judge Noonan's books are copying them right and left. And are they liable if they keep selling copying machines to UCLA? Under your theory, I think yes. Under my theory, Your Honor, I think that factually it's possible. But I think that the distinction is that Xerox would say that we are not contributing. We're not materially contributing. We're selling a product. We're getting out of the marketplace. We make our money by selling that product, and then we are gone. We are not making the market. We are not providing the material. We do not have the ability to filter and block that infringement, which, by the way, in the Sony case, says no such thing about the ability to block or filter. Well, why isn't the ability to block in Sony and Xerox? You just don't sell to certain people. Because I'm glad you asked that, Judge Noonan, because that is the big distinction. Your Honor will remember that what Sony says is at the end of the day what you have to do is strike a balance. What's fair? What's just under the circumstances? And as I said to the court on page 420 of Sony, here's what the plaintiffs were asking for. They were asking for an injunction against the manufacture and marketing of the Betamax VTR. We're not asking for that. We're not asking for that at all. We're not saying that peer-to-peer systems shouldn't operate. We're only saying, and I will quote the court from Sony again, we're saying exactly what Sony said we could ask for, and this is at page, I think it's 446. In an action for contributory infringement against the seller of copying equipment, the copyright holder may not prevail unless the relief he seeks affects only his programs, or unless he speaks for virtually all copyright holders. Well, we do both here, but on a more limited basis, certainly. The relief we seek affects only us. Put in a system so that you'll ban users when we tell you that they're infringing. Put in a system so that you will implement blocking of our works and continue to sell your VTR, continue to distribute your software, continue to set up your distribution of non-infringing works. That's the balance here. And that's why Sony is completely different than this case. Unless the court has anything. Thank you. Excellent arguments, and the briefing has been superb. We will take the case under advisement, and we're adjourned for this session. All rise. This court for this session stands adjourned. Thank you.
judges: Boochever, Noonan, Thomas